# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# NORTHERN DIVISION

ALISON PATRICIA TAYLOR,

                Plaintiff,

vs.

CITY OF SAGINAW and TABITHA HOSKINS,

                Defendant.
_____/

Case Number 17-cv-11067

Honorable Thomas L. Ludington

## OPINION AND ORDER GRANTING MOTION TO DISMISS AND DISMISSING PLAINTIFF'S AMENDED COMPLAINT

On April 5, 2017, Plaintiff Alison Taylor filed a complaint advancing an unorthodox legal theory: that the City of Saginaw's practice of placing a chalk mark on parked cars while enforcing parking regulations violates the Fourth Amendment. ECF No. 1. Taylor names the City of Saginaw and Tabitha Hoskins, a City of Saginaw parking enforcement official, as Defendants. After Taylor filed an amended complaint, ECF No. 9, Defendants filed a motion to dismiss. ECF No. 10. For the following reasons, that motion will be granted.

### I.

Plaintiff Alison Patricia Taylor lives in the County of Saginaw. Since 2014, Taylor has received fourteen parking tickets "for allegedly exceeding the time limit of a parking spot." Am. Compl. at 2, ECF No. 9.[1] Taylor alleges that all fourteen tickets were issued by Defendant Tabitha Hoskins, "the most prolific issuer of parking tickets" in the City of Saginaw. *Id.* at 3.

---

[1] In her response brief in opposition to the motion to dismiss, Taylor asserts that she has received fifteen parking tickets. Pl. Resp. Br. at 3, ECF No. 12. No explanation for this disparity has been provided.

Each parking ticket included the date and time that the tire of Taylor's vehicle was marked with a "chalk-like substance." *Id.*

According to Taylor, "[i]t is the official custom and practice of Defendant [City of Saginaw] for its parking enforcement officials (including Defendant [Hoskins]) to use this methodology of placing a chalk mark on one of the four tires of the vehicles to obtain information to justify the issuance of parking tickets throughout the territorial limits of the City of Saginaw." *Id.* Taylor alleges that Hoskins's practice is to chalk tires and then photograph the vehicle in question in order to "surreptitiously obtain information to justify the issuance of numerous parking tickets." *Id.* The practice of chalking tires is ongoing.

In her amended complaint, Taylor frames a putative class action suit against Defendants premised on the theory that the chalk marks violate the Fourth Amendment of the United States Constitution. Taylor requests the Court certify the case as a class action, declare Defendants' chalking practice unconstitutional, order Defendants to cease chalking vehicles, and order refunds of all tickets issued in reliance on the chalk marks.

## II.

Defendants are moving for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6). A pleading fails to state a claim under Rule 12(b)(6) if it does not contain allegations that support recovery under any recognizable legal theory. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In considering a Rule 12(b)(6) motion, the Court construes the pleading in the non-movant's favor and accepts the allegations of facts therein as true. *See Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008). The pleader need not provide "detailed factual allegations" to survive dismissal, but the "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause

of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In essence, the pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face" and "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678–79 (quotations and citation omitted).

### III.

In their motion to dismiss, Defendants argue, simply, that the Fourth Amendment does not prohibit municipalities from placing chalk marks on parked vehicles to aid in enforcement of parking regulations. That argument appears unremarkable. But Taylor believes that the Supreme Court's decision in *U.S. v. Jones* clearly establishes the unconstitutionality of "chalking." 565 U.S. 400. Taylor places more weight upon the *Jones* decision than it can bear. For the following reasons, the motion to dismiss will be granted.

### A.

The Fourth Amendment to the Constitution prohibits unreasonable searches and seizures:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. Amend. IV.

The Fourth Amendment analysis thus proceeds in two steps: 1) did a search or seizure occur, and if so, 2) was that search or seizure unreasonable? *See Terry v. Ohio*, 392 U.S. 1, 19 (1968) (explaining that a Fourth Amendment "search" occurs when a person is stopped and patted down, but that a pat-down search does not violate the Fourth Amendment as long as the officer

has a reasonable, articulable suspicion that criminal activity is occurring). Warrantless searches and seizures are presumptively unreasonable. *See Kentucky v. King*, 563 U.S. 452, 459 (2011).

After the Supreme Court's decision in *Katz v. United States*, the determination that a search or seizure occurred required satisfaction of two elements: "first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'" 389 U.S. 347, 361 (1967) (Harlan, J., concurring). In *United States v. Jones*, however, the Supreme Court revived an alternative basis for Fourth Amendment protection. Specifically, the *Jones* Court held that "the Government's installation of a GPS device on a target's vehicle" was a search under the Fourth Amendment because the physical installation of the device on the vehicle constituted a trespass of the defendant's property rights. 565 U.S. at 404. The majority opinion expressly confirmed that it was not relying on the *Katz*-two part analysis in holding that a search occurred:

> Jones's Fourth Amendment rights do not rise or fall with the *Katz* formulation. At bottom, we must "assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted." [*Kyllo v. United States*, 533 U.S. 27, 34 (2001)] As explained, for most of our history the Fourth Amendment was understood to embody a particular concern for government trespass upon the areas ("persons, houses, papers, and effects") it enumerates. *Katz* did not repudiate that understanding. Less than two years later the Court upheld defendants' contention that the Government could not introduce against them conversations between other people obtained by warrantless placement of electronic surveillance devices in their homes. The opinion rejected the dissent's contention that there was no Fourth Amendment violation "unless the conversational privacy of the homeowner himself is invaded." *Alderman v. United States*, 394 U.S. 165, 176, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969). "[W]e [do not] believe that Katz, by holding that the Fourth Amendment protects persons and their private conversations, was intended to withdraw any of the protection which the Amendment extends to the home...." *Id.*, at 180, 89 S.Ct. 961.

*Id.* at 406–407.

Importantly, the *Jones* Court also clarified that "[t]respass alone does not qualify [as a search]. *Id.* at 408 n.5. Rather, there must be both trespass and "an attempt to find something or to obtain information." *Id.*

**B.**

Defendants argue, first, that the "chalking" which occurred here was not a search and further argue that, even if it constituted a search, the search was reasonable. Those arguments will be addressed in turn. Reasonable minds might disagree regarding whether a search occurred here, but there is no doubt that any such search was not unreasonable in a constitutional sense.

**1.**

In arguing that the "chalking" which occurred here was not a Fourth Amendment search, Defendants argue that the chalk mark was not made for the purpose of gathering information. Defendants emphasize that a chalk mark is not an "information gathering device" like the GPS-tracker at issue in *Jones*. And Defendants further assert that "Hoskins did not gain any information about where the vehicle had been, where it was going, or any activities that the Plaintiff may have engaged in. Indeed, she did not gain any information at all." Mot. Dis. At 8, ECF No. 10. Naturally, Taylor views the chalk mark differently:

> [Hoskins's] purpose is undisputed: to start collecting and later extract information as to how long marked private vehicles have been parked in particular places. The chalk mark is placed at the time where there is no suspicion of any actual unlawfulness or probable cause of wrongdoing. It is merely to obtain information of potential future wrongdoing so that the government may punish a citizen. . . . That is a search under *Jones*.

Pl. Resp. Br. at 2.

Despite the low-tech nature of the investigative technique at issue here, the chalk marks clearly provided information to Hoskins. Specifically, the marks served to *identify* vehicles that

had been parked in a certain spot since the last round made by Hoskins. Admittedly (and unlike the GPS-device in *Jones*), the chalk marks did not track vehicles, but Defendants have provided no legal authority for the assertion that tracking is required. Rather, the *Jones* Court simply focused on the fact that the investigators had "physically occupied private property for the purpose of obtaining information." 565 U.S. at 404. There is no basis in the *Jones* opinion for strictly limiting the scope of the opinion to only physical invasions involving tracking devices, and Defendants provide no alternative legal support for such a construction.

Likewise, Hoskins's practice of placing a physical chalk mark on vehicles tires constitutes a trespass under *Jones*. Undoubtedly, the chalk mark was harmless and temporary. But under traditional understandings of property law, trespass can occur even if no damage is done. Justice Scalia addressed that very issue in *Jones*:

> It is important to be clear about what occurred in this case: The Government physically occupied private property for the purpose of obtaining information. We have no doubt that such a physical intrusion would have been considered a "search" within the meaning of the Fourth Amendment when it was adopted. *Entick v. Carrington*, 95 Eng. Rep. 807 (C.P. 1765), is a "case we have described as a 'monument of English freedom' 'undoubtedly familiar' to 'every American statesman' at the time the Constitution was adopted, and considered to be 'the true and ultimate expression of constitutional law' " with regard to search and seizure. *Brower v. County of Inyo*, 489 U.S. 593, 596, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989) (quoting *Boyd v. United States*, 116 U.S. 616, 626, 6 S.Ct. 524, 29 L.Ed. 746 (1886)). In that case, Lord Camden expressed in plain terms the significance of property rights in search-and-seizure analysis:
>
>> "[O]ur law holds the property of every man so sacred, that no man can set his foot upon his neighbour's close without his leave; if he does he is a trespasser, *though he does no damage at all*; if he will tread upon his neighbour's ground, he must justify it by law." *Entick*, supra, at 817.

*Jones*, 565 U.S. at 404–05 (emphasis added).

The City of Saginaw's chalking practice thus appears to satisfy the *Jones* two-part test for identifying a search.

Approximately a year after *Jones*, the Supreme Court revisited the question of when a physical intrusion by the Government constitutes a search. In *Florida v. Jardines*, officers brought a drug-sniffing dog on a homeowner's porch, without permission, to investigate whether drugs were inside the residence. 133 S. Ct. 1409 (2013). The Court explained that the *Jones* decision "renders this case a straightforward one": the officers gathered "information by physically entering and occupying the area to engage in conduct not explicitly or implicitly permitted by the homeowner." *Id.* at 1414. In holding that the entry of the dog onto the porch constituted a search, the Supreme Court discussed whether the physical intrusion was "unlicensed." *Id.* at 1415.

> The Court explained:
>
> "A license may be implied from the habits of the country," notwithstanding the "strict rule of the English common law as to entry upon a close." *McKee v. Gratz*, 260 U.S. 127, 136, 43 S.Ct. 16, 67 L.Ed. 167 (1922) (Holmes, J.). We have accordingly recognized that "the knocker on the front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers and peddlers of all kinds." *Breard v. Alexandria*, 341 U.S. 622, 626, 71 S.Ct. 920, 95 L.Ed. 1233 (1951). This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave. Complying with the terms of that traditional invitation does not require fine-grained legal knowledge; it is generally managed without incident by the Nation's Girl Scouts and trick-or-treaters. Thus, a police officer not armed with a warrant may approach a home and knock, precisely because that is "no more than any private citizen might do." *Kentucky v. King*, 563 U.S. ——, ——, 131 S.Ct. 1849, 1862, 179 L.Ed.2d 865 (2011).

*Id.* at 1415–16. Because there "is no customary invitation" to introduce "a trained police dog to explore the area around the home," the intrusion constituted a search. *Id.* at 1416. In other words, "the background social norms that invite a visitor to the front door do not invite him there to conduct a search." *Id.*

Here, the practice of chalking is arguably licensed by "'the habits of the country.'" *McKee*, 260 U.S. at 136. Taylor repeatedly asserts in her pleadings and briefing that the practice of chalking is "how we've always done it." *See* Compl. at 1 ("The hue and cry of 'that's the way we've always done it' does not turn an unconstitutional activity into a constitutional one."); Resp. Br. at 2 (same sentence verbatim); *id.* at 20 ("Some things that may have once thought to have been legal (i.e. warrantless trespasses to vehicles on public streets) becomes expressly illegal by the never-ending progress the law takes to make a more just, righteous, and constitutional society through legal challenges to the status quo."). Defendants assert that

> it should not be disputed that a "habit" of this country has long been for time-based parking regulations to be enforced by temporarily marking a vehicle's tires with chalk. The utilization of such practices is hardly unique to the City of Saginaw. Rather, it could be characterized as a pervasive practice that has been utilized by municipalities since sometime after the advent of the automobile.

Mot. Dismiss at 12.

The very fact that the parties appear to agree that chalking is a widespread and long-standing feature of parking enforcement undercuts Taylor's assertion that the physical trespass was unlicensed. Taylor's decision to use public parking could be construed as an implicit license for the City to enforce its parking regulations, including via the longstanding practice of chalking. Further, the type of physical trespass here appears to be "no more than any private citizen might do." *King*, 563 U.S. at 469. Private citizens frequently leave fliers and coupons on vehicles without permission. It is unclear how leaving a small, temporary chalk mark is distinguishable.

Despite Taylor's apparent admission that chalking is a long-standing and well-known practice, this is a close question. It is conceivable that some might dispute the idea that chalking is a "habit" of the country and thus that an implied license to chalking exist. The question of whether an implicit license to chalk exists is too factually driven to resolve at the motion to

dismiss stage. Accepting all well-pleaded factual allegations as true, Taylor has likely alleged that Defendants "searched" her vehicle within the meaning of the Fourth Amendment.

**2.**

But, contrary to Taylor's assertion, the existence of a "search" does not end the inquiry. *Jones* involved only the question of whether a Fourth Amendment search had occurred. In fact, the *Jones* Court took care to specify that it was not addressing whether the attachment of the GPS-device was reasonable under the Fourth Amendment:

> The Government argues in the alternative that even if the attachment and use of the device was a search, it was reasonable—and thus lawful—under the Fourth Amendment because "officers had reasonable suspicion, and indeed probable cause, to believe that [Jones] was a leader in a large-scale cocaine distribution conspiracy." Brief for United States 50–51. We have no occasion to consider this argument. The Government did not raise it below, and the D.C. Circuit therefore did not address it. *See* 625 F.3d, at 767 (Ginsburg, Tatel, and Griffith, JJ., concurring in denial of rehearing en banc). We consider the argument forfeited.

*Jones*, 565 U.S. at 413.

In her response brief, Taylor fails to apprehend that *Jones* involved only the first step of the Fourth Amendment analysis. Under *Jones*, the chalking may have been a search, but even assuming it was, the Fourth Amendment was violated only if the search was unreasonable. For several reasons, it was not.

First, "[t]he search of an automobile is far less intrusive on the rights protected by the Fourth Amendment than the search of one's person or of a building." *Almeida-Sanchez v. United States*, 413 U.S. 266, 279 (1973). "One has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects. A car has little capacity for escaping public scrutiny. It travels public thoroughfares where its occupants and its contents are in plain view." *Cardwell v. Lewis*, 417 U.S. 583, 590 (1974).

In *Cardwell v. Lewis*, the Supreme Court held that a vehicle "'search' limited to the examination of the tire on the wheel and the taking of paint scrapings from the exterior of the vehicle left in the public parking lot" did not violate the Fourth Amendment. *Id.* at 591. *Cardwell* was decided prior to *Jones* and thus relied on the *Katz* analysis which focuses on expectation of privacy. As the *Jones* Court explained, it is unclear whether the *Cardwell* decision held that no search occurred, or that the search in question was reasonable. *See* 565 U.S. at 410 n. 7. Applying the *Jones* rationale to the *Cardwell* facts, it seems clear that taking paint scrapings from a vehicle would constitute a "physical intrusion of a constitutionally protected area in order to obtain information." *Jones*, 565 U.S. at 407. *Cardwell* could thus be fairly construed as supporting the conclusion that, even post-*Jones*, taking paint scrapings from a car without a warrant is not unreasonable and thus not an unconstitutional search. Here, where the "search" in question involved taking nothing from the vehicle and, in fact, doing no permanent damage at all, the reasonableness of the "search" seems even clearer.

Defendant additionally argues that chalking would be covered by the community caretaking exception to Fourth Amendment protection. The classic context where the community caretaking exception applies is when police officers have non-criminal interaction with automobiles. As the Supreme Court explained in *Cady v. Dombrowski*:

> Because of the extensive regulation of motor vehicles and traffic, and also because of the frequency with which a vehicle can become disabled or involved in an accident on public highways, the extent of police-citizen contact involving automobiles will be substantially greater than police-citizen contact in a home or office. Some such contacts will occur because the officer may believe the operator has violated a criminal statute, but many more will not be of that nature. Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.

413 U.S. 433, 441 (1973) (concluding that towing an automobile to a private garage without probable cause to believe it contained evidence of a crime did not violate the Fourth Amendment).

And, in *South Dakota v. Opperman*, the Supreme Court expressly confirmed that the community caretaking exception applies in the parking enforcement context: "Police will also frequently remove and impound automobiles which violate parking ordinances and which thereby jeopardize both the public safety and the efficient movement of vehicular traffic. The authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge." 428 U.S. 364, 369 (1976) (holding that an inventory search of a vehicle that was impounded after multiple parking violations was reasonable under the Fourth Amendment).

The jurisprudence defining the community caretaking exception governs in this matter. Taylor cannot reasonably argue that the City of Saginaw does not have authority to enforce its parking regulations, and the practice of chalking is a reasonable exercise of that authority. Taylor argues that the community caretaking exception does not apply because it requires that the officer's actions be "totally divorced" from an attempt to collect evidence of wrongdoing. Pl. Resp. Br. at 13–14. That is incorrect. The distinction the cases draw is between investigations "relating to the violation of a *criminal* statute" and the officer's administrative duties. *See Cady*, 413 U.S. at 441 (emphasis added). As Defendants explain, violations of parking regulations do not give rise to criminal liability. And Taylor ignores the Supreme Court's unmistakable assertion that "[t]he authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and *convenience* is beyond challenge." *Opperman*, 428 U.S. at 369 (emphasis added). Active enforcement of parking regulations benefits the public by ensuring

convenient access to public parking. If the police have the authority to impound a vehicle while enforcing parking regulations, surely they have the authority to chalk a vehicle's tire while enforcing parking regulations.

Taylor argues that the crucial distinction here is that the chalk mark was made *before* any suspicion of wrongdoing exists. But Taylor does not explain why that difference mandates a finding that the search is unreasonable. Rather, Taylor simply reiterates her belief that *Jones* compels the conclusion that a search has occurred. Def. Resp. Br. at 15. That may be true, but *Jones* provides no guidance in determining whether the search was reasonable. Considering the *de minimis* nature of the physical intrusion here and the Government's undeniable authority to enforce parking regulations, this practice seems to clearly fall within the community caretaking exception. As such, the search (if one occurred) was reasonable.[2] Because, even accepting all well-pleaded factual allegations as true, Taylor has not asserted a cognizable constitutional claim, the motion to dismiss will be granted.

**IV.**

Accordingly, it is **ORDERED** that Defendants' motion to dismiss, ECF No. 10, is **GRANTED.**

It is further **ORDERED** that Plaintiff Taylor's amended complaint, ECF No. 9, is **DISMISSED.**

Dated: September 15, 2017    s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

---

[2] Defendants also argue that the administrative search exception may apply here, relying upon *New York v. Burger*, 482 U.S. 691, 708 (1987). While a plausible argument, the community caretaking exception is a better fit because of the factual similarities in *Cady* and *Opperman*. And, more fundamentally, the "ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006). The idea that placing a harmless, temporary, and unobtrusive mark on a vehicle tire bears constitutional significance has no merit. Considering the almost nonexistent interference with Taylor's property and privacy rights, the government interest necessary to establish "reasonableness" is minimal.

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on September 15, 2017.

                                          s/Kelly Winslow
                                          KELLY WINSLOW, Case Manager